[No. 25137-6-I. Division One. May 6, 1991.]

THE STATE OF WASHINGTON, on the Relation of Lou Taylor, ET AL, *Appellant*, v. DONALD T. REAY, ET AL, *Respondents*.

*Douglass A. North* and *Maltman, Weber, Reed, North & Ahrens,* for appellant.

*Heather Houston, Stephen M. Todd, William R. Hickman,* and *Reed McClure,* for respondents.

SCHOLFIELD, J.—Lou and Nina Taylor brought this action for a writ of mandamus, seeking to compel the King County Medical Examiner to change an official determination that their daughter, Karen Taylor Erickson, committed suicide. The Taylors appeal the jury verdict upholding the medical examiner's decision. We affirm.

## FACTS

At approximately noon on June 20, 1981, John Erickson returned home from umpiring a boys' baseball game to find his wife, 26-year-old Karen Taylor Erickson, lying on the floor of an upstairs bedroom. After his initial attempts to resuscitate her were unsuccessful, Erickson called 911 and shouted to a neighbor to call an ambulance. Prior to the arrival of the medics, Erickson made further attempts to revive Karen, at which point he noticed a stain on her blouse. He also noticed that his handgun, normally kept fully loaded in another bedroom, was lying in a suitcase on the bed nearby. It was later determined that Karen Erickson had died as the result of a single gunshot wound through her chest.

After police and medics arrived at the scene, John Erickson gave a statement to Detective Brooks of the King County Police. Brooks stated that Erickson appeared visibly shaken during the interview. Just prior to the interview, another officer observed Erickson in the back of a police car, apparently crying. Within 1 week of his wife's death,

John Erickson submitted to a polygraph test which police indicated he "passed with no problems." Exhibit 50.

The police investigation turned up no evidence of burglary, robbery or forced entry into the home. Nor was there evidence that a struggle had taken place: the victim had no defensive wounds, scratch marks or torn clothing. John Erickson's alibi—that he had left his home that morning to umpire a boys' baseball game and later returned to find his wife dead—was verified. Based on the evidence at the scene and the autopsy findings, Karen Erickson's death was ruled a suicide.

Former King County Medical Examiner John Eisele stated that the suicide determination was based on a number of factors: (1) there was no evidence that anyone other than Karen Erickson had been in the home at the time of her death;[1] (2) the "close–to–contact" nature of the wound was typical of suicide cases;[2] (3) the gun was found at the scene a short distance from the victim, a fact unusual in homicide cases; (4) the site of the wound was consistent with suicide; and (5) the weapon was loaded and easily accessible to Karen.

Karen Erickson's parents, Lou and Nina Taylor, could not accept the determination that their daughter had committed suicide. Rather, they believed that their son–in–law, John Erickson, had killed Karen. They contacted the King County Ombudsman and expressed their concerns regarding the medical examiner's determination. The police conducted a follow–up investigation in which many witnesses were reinterviewed. The Taylors also enlisted the assistance

---

[1]In a report dated December 9, 1981, Eisele indicated that a factor considered in the suicide determination was "the husband's accountability at the time of the death and the confirmation of his statements by lie detector." Exhibit 33.

[2]A "close–to–contact" wound is essentially close enough that the heat from the muzzle sears or burns the skin but not so close that the muzzle is tightly sealed against the skin. Eisele concluded that the muzzle of the gun had been within 1 inch of Karen's body when fired.

of a private investigator, a forensic scientist and investigative media reporters. After evaluating the facts of the investigation and meeting with the Taylors on several occasions, the police ultimately found no basis to conclude that Karen Erickson's death was a homicide.

The Taylors subsequently filed this mandamus action, seeking to compel the King County Medical Examiner to change the cause of death determination from suicide to a "finding other than suicide supported by the facts." The case was tried before a jury in September 1989. Prior to trial, the Taylors moved to exclude evidence of the results of John Erickson's polygraph examination. However, because the issue in the case was whether the medical examiner made a proper judgment based on the available information, and polygraph evidence was among the items considered by the medical examiner, the court ruled that such evidence could be considered by the jury with a limiting instruction. Limited reference was made to this evidence during the testimony, but during deliberations the jury received at least four exhibits indicating the polygraph results.

Based on the language of RCW 70.58.170,[3] the Taylors also requested that the jury be instructed that the medical examiner must certify the cause of death to his "best knowledge and belief". They proposed that this instruction be given in addition to the instruction on the arbitrary and capricious standard supplied to the jury. The court refused the instruction, expressing concern that the jury would be confused as to whether the "best knowledge and belief" language of RCW 70.58.170 established a standard of review separate from the arbitrary and capricious standard. From a jury verdict in favor of respondents, the Taylors appeal.

---

[3]RCW 70.58.170 provides as follows in pertinent part: "[The funeral director] shall present the certificate of death to the physician last in attendance upon the deceased, or, if the deceased died without medical attendance, to the health officer, coroner, or prosecuting attorney having jurisdiction, who shall thereupon certify the cause of death according to his best knowledge and belief . . .".

#### Sufficiency of Jury Instructions

The Taylors contend that, in addition to instructing the jury on the arbitrary and capricious standard, the trial court should have instructed the jury that the medical examiner's decision must be made "according to his best knowledge and belief", as provided in RCW 70.58.170. They contend that the jury needed to know of this standard in order to determine whether the medical examiner had acted arbitrarily and capriciously. The actual instructions provided as follows regarding the standard to be used in reviewing the medical examiner's decision:

> The petitioners have the burden of proving the following proposition:
> That respondents have acted arbitrarily and capriciously in concluding that the manner of death of Karen Taylor Erickson was a suicide.

Instruction 5, in part.

> Arbitrary and capricious action means willful and unreasoning action, without consideration and in disregard of facts or circumstances. Where there is room for two opinions, action is not arbitrary or capricious when exercised honestly and upon due consideration, even though it may be believed that an erroneous conclusion has been reached.

Instruction 6. The instruction proposed by the Taylors was based on RCW 70.58.170 and would have added the following language: "A statute says that the Medical Examiner shall certify the cause of death according to his 'best knowledge and belief.'"[4]

 The test for sufficiency of instructions is whether the instructions, read as a whole, allow counsel to argue their theory of the case, are not misleading, and properly inform the trier of fact of the applicable law. *Sturgeon v. Celotex Corp.*, 52 Wn. App. 609, 762 P.2d 1156 (1988). The trial court has considerable discretion as to how its instructions will be worded and as to how many instructions are necessary to fairly present each litigant's theories. *Jensen v.*

---

[4]An accompanying proposed instruction read: "The use of the superlative "best" means of the highest quality or the greatest usefulness for the purpose intended, [and] requires rigorous investigation of the death."

*Beaird,* 40 Wn. App. 1, 15, 696 P.2d 612, *review denied,* 103 Wn.2d 1038 (1985). While it is proper for the court to instruct the jury in the language of a statute, it is not required to do so. *Lindsey v. Elkins,* 154 Wash. 588, 607, 283 P. 447 (1929).

■ RCW 70.58.170 requires that the coroner or other official "certify the cause of death according to his best knowledge and belief . . .". The certification decision is a discretionary one, and the scope of trial court review is limited to whether that discretion was exercised arbitrarily and capriciously. *See Vanderpool v. Rabideau,* 16 Wn. App. 496, 498, 557 P.2d 21 (1976). The jury here was properly instructed that action "is not arbitrary or capricious when exercised *honestly* and *upon due consideration, . . .".* (Italics ours.) Instruction 6, in part; *see also Vanderpool,* at 498 (arbitrary and capricious defined).

We find no error in the instructions as given. The arbitrary and capricious standard requires that an official act honestly and upon due consideration, and it is implicit in this requirement that the official use his or her best knowledge and belief. Honest action also implies the use of one's expertise in determining cause and manner of death, as well as the consideration of all information at his or her disposal. The instructions given here were sufficient.

## Polygraph Evidence

Over the Taylors' objection, the jury was permitted to receive evidence that John Erickson had taken a polygraph examination shortly after his wife's death. The exhibits and reports received by the jury contained conclusions that Erickson had "passed" the examination. The jury was also given the following limiting instruction:

> You will hear testimony concerning the use of a polygraph in this case. There is scientific dispute about the reliability of the polygraph and the polygraph is not generally accepted in the scientific community as reliable.
> Based on the current scientific data supplied to the court of this state, the polygraph has not been shown to be sufficiently reliable as an indicator of truthfulness to be admissible in court proceedings.

However, the polygraph is used by law enforcement as an investigatory tool and you may consider its use here in evaluating the conduct and investigation carried out by the Medical Examiner.

You are instructed that the result of the test of the deceased's husband may not be considered by you as reliable evidence that the husband did or did not kill his wife.

In allowing the polygraph evidence, the trial judge explained that the medical examiner, in the course of his investigation, is not limited to consideration of only that evidence which is admissible in court. Because the issue in the case was the appropriateness of the medical examiner's actions and the evidence he relied upon in taking those actions, the trial court believed it would be improper and artificial not to allow consideration of the polygraph. The court therefore ruled that the jury could consider the evidence in evaluating the medical examiner's conduct, with a limiting instruction.

█ █ Evidence of John Erickson's polygraph results was relevant here as the results were relied on by the medical examiner in classifying Karen Erickson's death as a suicide. Relevant evidence may be excluded under ER 403, however, if the trial court concludes that its probative value is substantially outweighed by the danger of unfair prejudice, if it is wasteful of time or cumulative, or if it is confusing or misleading to the jury. *Lockwood v. AC&S, Inc.,* 44 Wn. App. 330, 350, 722 P.2d 826 (1986), *aff'd,* 109 Wn.2d 235, 744 P.2d 605 (1987). The trial court has considerable discretion in balancing the probative value of evidence against its potential prejudicial impact, and its decision to admit relevant evidence will not be reversed absent a manifest abuse of discretion. *State v. Hughes,* 106 Wn.2d 176, 201–02, 721 P.2d 902 (1986).

The admissibility of polygraph evidence was recently addressed by the court in *Industrial Indem. Co. of the Northwest, Inc. v. Kallevig,* 114 Wn.2d 907, 792 P.2d 520 (1990). In *Kallevig,* insurer Industrial Indemnity sought a

declaratory judgment that its insured, Kallevig, had intentionally caused a fire that destroyed his restaurant. *Kallevig,* at 910. Kallevig counterclaimed for bad faith denial of coverage. *Kallevig,* at 913. Prior to trial, the trial court excluded Industrial Indemnity's evidence that a factor in its decision to deny Kallevig's claim was his refusal to take a polygraph examination. *Kallevig,* at 914. On appeal, the court found no abuse of discretion:

> Because the jury was to decide both the declaratory judgment claim, in which Industrial Indemnity's defense was that David Kallevig committed arson, and the bad faith counterclaim, the trial court properly concluded that the evidence was unduly prejudicial.

*Kallevig,* at 926. The *Kallevig* court distinguished *Moskos v. National Ben Franklin Ins. Co.,* 60 Ill. App. 3d 130, 376 N.E.2d 388 (1978), in which the court permitted polygraph evidence on the issue of an insurer's good faith in denying a claim. *Kallevig,* at 926–27. The court noted that in *Moskos,* the trial court had bifurcated the bad faith claim from the policy claim, and that "[b]ecause of the bifurcation, . . . there was no danger that the polygraph evidence would prejudicially affect the insured on the policy claim." *Kallevig,* at 927.

The concern over prejudice in *Kallevig* arose out of the potential of the jury considering the polygraph as evidence that Kallevig had committed arson, the disputed fact relating to the policy claim. *See Kallevig,* at 925–27. Similar concerns were not expressed regarding the bad faith claim, however, as the evidence was offered only to show that Industrial Indemnity had acted reasonably in denying his claim, and not as evidence of Kallevig's misconduct. *See Kallevig,* at 925–27. As noted by the court in *Brown v. Darcy,* 783 F.2d 1389 (9th Cir. 1986), the key question surrounds the purpose for which the polygraph evidence is sought to be introduced:

> If the polygraph evidence is being introduced because it is relevant that a polygraph was administered regardless of the results, . . . then the polygraph evidence may be admissible as an operative fact. If, on the other hand, the polygraph evidence

is offered to establish that one party's version of the events is the truth, the polygraph evidence is being introduced for its substantive value and is inadmissible absent a stipulation . . ..

(Footnote omitted.) *Brown*, at 1397. *See also Barnier v. Szentmiklosi*, 810 F.2d 594 (6th Cir. 1987) (under certain circumstances the fact that polygraph was taken may be relevant and admissible for purposes other than establishing the truth or falsity of a disputed fact); *Criss v. Springfield Township*, 56 Ohio St. 3d 82, 564 N.E.2d 440 (1990) (polygraph examinations conducted as part of police investigation admissible to show state of mind of police officers who are defending against claim of malicious prosecution).

John Erickson was not a party to this action, and the jury in this case was not asked to decide whether he was responsible for his wife's death. Nor was the polygraph evidence offered to establish that he did not kill his wife. The only issue in this mandamus proceeding was whether the medical examiner had acted arbitrarily and capriciously in classifying Karen Taylor Erickson's death as a suicide. Central to this inquiry was an examination of the evidence relied upon by the medical examiner in making his decision, including the polygraph evidence. The fact that the examination was given was directly relevant both to the thoroughness of the police investigation, as well as the medical examiner's suicide determination.[5] The potential for prejudice was negligible in light of the purpose for which the polygraph was admitted, as well as the limiting instruction given to the jury.[6] For these reasons, we find no

---

[5]We note that in the *absence* of any evidence that John Erickson had been given a polygraph examination, the jury could conceivably question the thoroughness of the police investigation as well as the medical examiner's conclusions.

[6]A jury is presumed to follow the court's instructions and that presumption will prevail until it is overcome by a showing otherwise. *Carnation Co. v. Hill*, 115 Wn.2d 184, 187, 796 P.2d 416 (1990). The jury here was instructed that while the polygraph is used by law enforcement as an investigatory tool, it was not admissible in court proceedings as it had not been shown sufficiently reliable as an indicator of truthfulness. The jury was further instructed that the polygraph could not be considered as reliable evidence that John Erickson did or did not kill his wife.

abuse of discretion in the trial court's admission of the evidence.

### ATTORNEY'S FEES ON APPEAL

Respondents have moved for attorney's fees pursuant to RAP 18.9 on the grounds that the Taylors' appeal is frivolous. They rely on *Millers Cas. Ins. Co. v. Briggs,* 100 Wn.2d 9, 15, 665 P.2d 887 (1983) (quoting *Streater v. White,* 26 Wn. App. 430, 435, 613 P.2d 187 (1980)), where the court stated: "[A]n appeal is frivolous if there are no debatable issues upon which reasonable minds might differ, and it is so totally devoid of merit that there was no reasonable possibility of reversal."

This standard is clearly not met here. The propriety of the admission of the polygraph evidence in this case is a debatable one on which reasonable minds could differ. Respondents are not entitled to attorney's fees.

Judgment affirmed.

FORREST and KENNEDY, JJ., concur.